J-A08039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1326 WDA 2021 |

Appeal from the Order Entered October 7, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000075-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: S.M.-B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1327 WDA 2021 |

Appeal from the Order Entered October 7, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000074-2020

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                **FILED: MAY 27, 2022**

R.M. ("Father") appeals from the orders entered on October 7, 2021, in

the Court of Common Pleas of Allegheny County, involuntarily terminating his

parental rights to his daughters, S.M.-B., born in January of 2018, and A.B., born in September of 2018 (collectively, "the Children").[1,2] We affirm.

The relevant facts and procedural history are as follows. On April 20, 2018, the juvenile court placed nearly three-month-old S.M.-B., the older child, in the emergency protective custody of Allegheny County Department of Human Services, Office of Children, Youth and Families ("OCYF"), due to medical personnel deeming non-accidental the injuries she sustained while in the care of Father and Mother. N.T. Termination H'rg, 9/24/21, at 6–7, 63–64. On or about April 19, 2018, Mother brought S.M.-B. to Children's Hospital of Pittsburgh ("Children's Hospital"), and the x-rays performed there revealed that the child had three posterior rib fractures. *Id.* at 63. Jennifer Wolford, M.D., the attending physician in the Division of Child Advocacy at Children's Hospital, estimated that the fractures were two to four weeks old, and they were in the process of healing. *Id.* at 62-63.

S.M.-B. received follow-up x-rays at Children's Hospital thirteen days later. N.T. Termination H'rg at 64, 75–76. In addition to the progressive healing of her rib fractures, the x-rays revealed that S.M.-B. had a left distal

---

[1] The orders also involuntarily terminated the parental rights of C.B. ("Mother"), but she did not file notices of appeal.

[2] The Honorable Paul E. Cozza presided over the Children's underlying dependency cases and the subject involuntary termination proceeding.

tibia bucket handle fracture ("tibia fracture"),[3] which had also started to heal. *Id.* at 64. Dr. Wolford opined that S.M.-B.'s tibia fracture had occurred before the first set of x-rays were performed; however, it was newer than her rib fractures and had not yet begun to heal, which made it not visible on those x-rays. *Id.* at 66. Dr. Wolford opined that S.M.-B.'s rib fractures and tibia fracture were the result of two separate incidents of physical child abuse, both of which were committed while the child was in the care of Father and Mother.[4] *Id.* at 64–70.

Mother was charged with multiple crimes related to S.M.-B.'s injuries. N.T. Termination H'rg at 9. On March 21, 2019, Mother pled guilty to the crime of endangering another person, and the court sentenced her to one year

---

[3] According to Dr. Wolford, the tibia is the shin bone. N.T. Termination H'rg, at 69. She testified:

> [T]hese bucket handle fractures[,] or corner fractures[,] are the result of [the] growth plate . . . being pulled off of the bone. So this is a jerk or a pull where that bone growth plate separates. . . . [They are] often associated with diaper changes when an adult gets frustrated with a child. . . . This is the result of violence. . . . This is the result of being picked up by a leg. This is a violent jerk and a pull. Routine care, even in the middle of a messy diaper by a reasonable adult caretaker, does not break or cause corner fractures.

*Id.* at 69–70.

[4] As best we can discern, S.M.-B. was injured at home in the presence of Father, Mother, and Father's twelve-year-old daughter, discussed *infra*. N.T. Termination H'rg, at 9, 73–74. Dr. Wolford opined that a twelve-year-old child would not have been able to cause the injuries S.M.-B. sustained. *Id.* at 68–69, 73–74.

of probation. ***Id.*** The certified record does not reveal whether a child abuse report was filed with respect to Mother under the Child Protective Services Law ("CPSL"), 23 Pa.C.S. §§ 6301 *et seq.*

Father was not criminally charged. N.T. Termination H'rg at 9. OCYF caseworker, Rhianna Diana, testified that a child abuse report was filed with respect to Father under the CPSL and, after investigation, it was "unfounded." ***Id.*** at 4-5, 34; 23 Pa.C.S. § 6303(a). Nonetheless, Father stated to the OCYF caseworker that he did not believe S.M.-B. had sustained the injuries at all. N.T. Termination H'rg at 35–36. In addition, neither Father nor Mother provided an explanation of S.M.-B.'s injuries to OCYF. ***Id.*** at 13.

On June 27, 2018, the juvenile court adjudicated S.M.-B. dependent. In furtherance of S.M.-B.'s permanency goal of reunification, Father was required to satisfy the following objectives: participate in a parenting program and make appropriate progress; maintain cooperation with OCYF and all service providers; maintain consistent and appropriate visitation; address allegations of domestic violence between Father and Mother; and address any mental health needs. N.T. Termination H'rg at 11.

A.B. was born prematurely in September of 2018. She was discharged from the hospital two months later and placed in the emergency custody of OCYF, which placed her in a different foster home than S.M.-B.[5] N.T.

---

[5] Ms. Diana testified that S.M.-B.'s foster parents were also given the opportunity to be a placement resource for A.B., but they were unable. N.T. Termination H'rg at 36.

- 4 -

Termination H'g at 32. The court adjudicated A.B. dependent on January 15, 2019.

Permanency review hearings occurred with respect to S.M.-B. on November 1, 2018, and with respect to the Children simultaneously in February, May, and November of 2019, as well as May and August of 2020. By August of 2020, the juvenile court found that Father had moderately complied with his permanency goals and had made moderate progress "towards alleviating the circumstances" which led to Children's initial placement. Orphans' Ct. Op., 12/9/21, at 7-8.

Nevertheless, Father continued to state to caseworkers that S.M.-B. did not sustain injuries. N.T. Termination H'rg at 35-36. Further, despite completing two batterer intervention programs, Father was arrested and charged in December of 2019, with crimes involving strangulation and simple assault committed against his thirteen-year-old daughter.[6] *Id.* at 11, 34. He pled guilty to simple assault. *Id.* at 11. In addition, during supervised visitation, S.M.-B.'s foster care caseworker, Laura Burlbaugh, observed that

_____

[6] Father has an older son and daughter, the Children's half–siblings, both of whom are minors. They had always resided in Father's custody, but, after the incident with his older daughter, both children went to reside with their biological mother. N.T. Termination H'rg at 15, 24. According to Ms. Diana, Father is forbidden contact with his older daughter by court order. *Id.* at 15.

Beginning in 2013, through the date that S.M.-B. was removed from Father's custody, OCYF received eleven reports with respect to his older children involving, *inter alia*, inappropriate parenting discipline. N.T. Termination H'rg at 10.

Father did not understand S.M.-B.'s development as he "would often try to get her to walk when she wasn't even rolling or crawling . . . yet[ and h]e often tried to get her to sit up on her own when she wasn't ready, which did lead into her hitting her head several times throughout visits." *Id.* at 39, 40-41. She also observed Father "struggle with managing both [C]hildren at the same time." *Id.* at 60.

Likewise, Amber Stallard, A.B.'s foster care caseworker, testified that she had concerns about Father's ability to keep the Children safe when they were both present with Father during supervised visitation. N.T. Termination H'rg at 137. She testified, "Father struggled with keeping after both [C]hildren, especially once [A.B.] was completely mobile." *Id.* She also testified that Father gave A.B. "things that were not appropriate for her age that posed . . . a choking hazard." *Id.*

On June 12, 2020, OCYF filed petitions for the involuntary termination of Father's and Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). It is important to note that, prior to the hearing, in March of 2021, the juvenile court suspended Father's and Mother's supervised visits with A.B., and they remained suspended at the time of the subject proceeding. N.T. Termination H'rg at 34. A.B.'s parents instead participated in virtual visits with her. *Id.* at 137-38.

Ms. Diana explained that the court suspended in-person visits because A.B. began "to exhibit increasing[ly] concerning self-injurious behaviors. She was observed to be hitting her head off the floor, hitting her head off the wall."

N.T. Termination H'rg at 35. She described one time when she and other caseworkers had difficulty returning A.B. to the car to go home because "she would go rigid." *Id.* A.B. is diagnosed with adjustment disorder with anxiety. *Id.* at 140. At the time of the hearing, A.B. was scheduled to begin therapy, and she was referred for therapeutic visitation with Father and Mother. *Id.* at 35, 140.

The evidentiary hearing occurred on September 24, 2021, during which Courtney Potter, Esquire, from KidsVoice, represented the Children.[7] OCYF presented the testimony of its caseworker, Ms. Diana; foster care caseworker from Presley Ridge, Ms. Burlbaugh, who supervised Father's visits with S.M.-B.; Dr. Wolford; and licensed psychologist, Gregory Lobb, Ph.D., who the juvenile court appointed to evaluate the family. OCYF also presented the testimony of Father, as on cross-examination, *via* video. The Children's counsel presented the testimony of Amber Stallard, A.B.'s foster care caseworker who supervised Father's visits with her. Mother testified on her own behalf.

By orders dated September 24, 2021, and entered on October 7, 2021, the orphans' court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). Father's counsel timely filed

---

[7] The orphans' court appointed KidsVoice to represent the Children's legal interests in the contested involuntary termination proceeding pursuant to 23 Pa.C.S. § 2313(a), as interpreted by *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017), and its progeny.

notices of appeal and concise statements of errors complained of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The court filed its Rule 1925(a) opinion on December 9, 2021.

Father presents the following issues on appeal:

1. Whether the [c]ourt erred in failing to specifically address the requirements of 23 Pa.C.S. § 2511(b)[?]

2. Whether the [c]ourt erred in finding that [OCYF] proved by clear and convincing evidence that the repeated incapacity, abuse, neglect or refusal of [ ] Father has caused the [Children] to be without essential parental care, control or subsistence necessary for [their] physical or mental well-being and the conditions and causes of any incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent under 23 Pa.C.S. § 2511(a)(2)[?]

3. Whether the [c]ourt erred in finding that [OCYF] proved by clear and convincing evidence that the conditions that led to the removal or placement of the [Children] continue to exist, [ ] Father cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the [Children] within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the [Children] under 23 Pa.C.S. § 2511(a)(5)[?]

4. Whether the [c]ourt erred in finding that [OCYF] proved by clear and convincing evidence that the conditions that led to the removal or placement of the [Children] continue to exist and termination of parental rights would best serve the needs and welfare of the [Children] under 23 Pa.C.S. § 2511(a)(8)[?]

5. Whether the [c]ourt's findings are against the weight of the evidence[?]

6. Whether the [c]ourt erred in failing to provide any specific findings of fact or conclusions of law to elucidate its statement that OCYF had met its burden of proof by clear and convincing evidence on all factors set forth by the [c]ourt[?]

Father's Brief at 6–7.

Our standard of review is well-settled. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Simply put, "[a]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123–24.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. 23 Pa.C.S. § 2511. The trial court must initially determine whether the conduct of the

parent warrants termination under Section 2511(a). Only if the court determines that the petitioner established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 358, *citing* **Matter of Adoption of Charles E.D.M., II**, 708 A.2d 88, 91 (Pa. 1998).

Instantly, the orphans' court terminated Father's parental rights pursuant to the following provisions of the Adoption Act.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \*   \*   \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \*   \*   \*
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist,

the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (5), (8), (b).

It is axiomatic that we need only agree with any one subsection of Section 2511(a), along with Section 2511(b), to affirm the termination of parental rights.  *In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (citation omitted).  In this case, we analyze the orders pursuant to Section 2511(a)(2).  Therefore, we do not review Father's third and fourth issues on appeal.

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal and incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). We have long recognized that a parent is required to make "diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (citation omitted). At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. *In re S.C.*, 247 A.3d at 1105 (citation omitted).

With respect to Section 2511(b), this Court has stated that the trial court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Our Supreme Court explained: "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.

The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Based on the requisite bifurcated analysis, we begin with Father's second issue on appeal, wherein he argues that the termination of his parental rights under Section 2511(a)(2) is not supported by clear and convincing evidence. Father relies upon the juvenile court's permanency review order dated May 16, 2019, which the orphans' court admitted as OCYF Exhibit 2, in asserting that he made "appropriate progress" in coached parenting through Project Star, and the parenting coach did not observe any safety concerns. Father's Brief at 25. Father acknowledges that there were five subsequent reports from his supervised visitation revealing the caseworkers had safety concerns regarding his care of the Children, but he directs us to Ms. Burlbaugh's testimony that, "[c]urrently, his visits overall go fine." *Id.* at 26, *citing* N.T. Termination H'rg at 43. Further, Father argues that the court abused its discretion to the extent that its conclusion under Section 2511(a)(2) was based upon "not knowing how S.M.-B.'s injuries occurred and Father's statements relating thereto." Father's Brief at 26. We disagree.

Father accurately cites the juvenile court's findings from the May 16, 2019, permanency order. However, Dr. Lobb, the licensed psychologist

appointed by the juvenile court to evaluate the family, testified that he spoke with Father's visit coach from Project Star. N.T. Termination H'rg at 121. He testified that the visit coach "had mentioned that [Father] had a difficult time balancing both of the [Children], especially since [A.B.] had started walking at that time. And she had concerns about him having unsupervised time with the [Children], related to his ability to keep both of the [Children] safe." *Id.* at 122.

Likewise, Ms. Burlbaugh explained that her concern regarding safety involved Father's "past struggle with managing both [C]hildren at the same time." N.T. Termination H'rg at 60. When asked on direct examination about Father's in-person visits, Ms. Burlbaugh testified, "[c]urrently, his visits overall go fine." *Id.* at 43. However, Father failed to reveal that her testimony referred to Father's in-person visits with S.M.-B. only. Indeed, for six months up to and including the time of the hearing, Father was having virtual visits with A.B. Because Father was visiting in-person with S.M.-B. only, there is no evidence in the certified record that he no longer posed a safety risk when parenting the Children **together**.

Further, Father pled guilty to simple assault for the 2019 incident involving his then thirteen-year-old daughter, discussed above. The orphans' court stated, "It is extremely concerning . . . that two children in Father's care have been the victims of physical child abuse." Orphans' Ct. Op. at 12.

The court also found that Father posed a continual risk to the Children because he "has consistently denied that S.M.-B. was the victim of child abuse

and instead advanced implausible theories about the cause of her injuries, with no way to substantiate his claims." Orphans' Ct. Op. at 11. The record supports the court's finding.

Father testified on cross-examination by the Children's counsel, as follows:

> Q. You heard the testimony of the caseworker, testimony that you have questioned whether [S.M.-B.] had these injuries and that you didn't believe that she actually had the injuries that were reported by Children's Hospital, correct?
>
> A. Correct. I can't tell as to who caused them.
>
>        *    *    *
>
> I have doubts as to who caused them. I was seeking possibilities of what could have happened to [S.M.-B.]. . . .
>
>        *    *    *
>
> **[I]f** she was injured[,] it was not by me. . . .

N.T. Termination H'rg at 88–89 (emphasis added).

Dr. Lobb provided three reports to the court regarding this family dated September 2, 2019, March 29, 2020, and March 21, 2021.[8] N.T. Termination H'rg at 115. He testified as follows on cross-examination by the Children's counsel:

> Q. I'm looking at Page 5 of your initial report, and you had spoken with [Father] about the injuries, and he told you that he did not believe that [S.M.-B.] was actually hurt, correct?

---

[8] The third report was not entered into evidence at the hearing and is not included in the certified record. **See infra** n.10.

- 15 -

A. That sounds correct, yes.

Q. And that he had an opinion of what the actual problem was, and he said he thought it was a [baby] formula issue?

A. Yes.

Q. [P]ursuant to that conversation with him, I think you had recommended that he should seek a second opinion if he truly believed [S.M.-B.] did not have these injuries, correct?

A. Yes.

Q. . . . Are you aware whether he ever sought a second opinion?

A. . . . I am not aware of another opinion that they were seeking after that conversation.

*Id.* at 115–16.  In his initial report, Dr. Lobb also stated that Father "minimizes [S.M.-B.'s] injuries and reported he is not even certain that she was injured[,] and this is very concerning."  *Id.* at 119–20; *see* Forensic Psychological Evaluation, 9/2/19, at 31 ("It is very concerning that this young child sustained significant injuries that have been confirmed as child abuse and none of the adults that were there to protect her are able to provide an explanation of how she was injured.").  Further, Dr. Lobb testified that, in general, Father never took responsibility for the Children's placement.  N.T. Termination H'rg at 121.  Dr. Lobb stated in his second report:  "What remains of latest concerns are there is still not an explanation as to what occurred with [S.M.-B.] and how she sustained these injuries."  *Id.* at 123; *see* Forensic Psychological Examination, 3/9/20, at 30.  Dr. Lobb testified that, at the time of his last report in March of 2021, the family had made no additional progress toward reunification.  N.T. Termination H'rg at 123.

Ms. Diana's testimony was consistent with Dr. Lobb's insofar as she stated Father "reported [not believing that S.M.-B. was actually injured] . . . numerous . . . times to myself. And had also continued to state that he wanted a second opinion. However, at this time neither parents['] medical or educational rights have been taken away from them. And it was explained to [Father] that he could always request a second opinion[,] and he never did so. . . ." N.T. Termination H'rg at 36.

In arguing that the court abused its discretion in terminating his parental rights because he has not explained how S.M.-B. sustained her injuries, Father relies upon our decision in *In re R.A.M.N.*, 230 A.3d 423 (Pa. Super. 2020). In that case, a panel of this Court affirmed the order denying the agency's petition to involuntarily terminate the mother's parental rights pursuant to Section 2511(a)(8) and (b). Specifically, the orphans' court concluded that the agency did not prove the conditions that led to placement continued to exist pursuant to Section 2511(a)(8). *Id.* at 429. The agency's sole argument was that the mother never provided a "plausible explanation" for the death of another child. *Id.* However, the mother was never criminally charged for the death, and the agency did not assert that she posed a current risk to her children. *Id.* at 425, 429.

We conclude that *R.A.M.N.* is not controlling. First, we are analyzing the subject termination orders under Section 2511(a)(2), which does not include the same component of Section 2511(a)(8) at issue in *R.A.M.N.* Second, in this case, OCYF presented evidence that Father continues to pose

- 17 -

a safety risk to the Children. The testimony set forth above establishes that Father takes no responsibility for the Children's placement, and further, throughout the underlying matter, has denied that S.M.-B. was even injured. N.T. Termination H'rg at 35-36, 115-16, 120-21. In addition, Father pled guilty to a crime involving a physical altercation with his then thirteen-year-old daughter in December of 2019, after the Children were adjudicated dependents. *Id.* at 11, 34. Pursuant to a no-contact order, Father is prohibited contact with his older daughter due to that incident. *Id.* at 15. Finally, the foster care caseworkers who supervised visitation testified that Father posed a safety risk to the Children when they were both together in his presence. *Id.* at 60, 137. Because A.B. was not participating in supervised visitation with Father for six months prior to the termination hearing, there is no evidence in the record that he can currently parent the Children safely at the same time. As such, we reject Father's reliance on *R.A.M.N.*

Contrary to Father's claim, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to Section 2511(a)(2). Father's repeated and continued incapacity, abuse, neglect or refusal to progress in satisfying the permanency plan objectives, including, but not limited to, acknowledging the physical injuries sustained by S.M.-B., has caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being. *See* 23 Pa.C.S. § 2511(a)(2). Further, Father's incapacity, abuse, neglect or refusal to make

progress toward reunification with the Children cannot or will not be remedied. **See id.** Thus, Father's second issue fails.

Turning to his first issue, Father argues that the court abused its discretion in terminating his parental rights pursuant to Section 2511(b). Specifically, Father asserts that a bond exists between him and the Children, and there was no evidence presented regarding the effect on the Children of severing that bond. Father's Brief at 21-22. This issue is without merit.

In its Rule 1925(a) opinion, the orphans' court stated that it "considered a number of factors including the bond between the [C]hildren and Father, the safety needs of the [C]hildren and [the] safety and security that the [C]hildren have with their respective foster parents." Orphans' Ct. Op. at 13. The court explained:

> The court recognizes that there is a bond between Father and the [C]hildren. Dr. Lobb reported that a bond existed in his 2019 and 2020 reports. However, it was his ultimate opinion that their need for permanence outweighed any detrimental effects that termination may cause. [N.T. Termination H'rg] at 100. . . .
>
> The [C]hildren have been in their respective foster homes since 2018. S.M.-B. was removed from her parents['] care at age two months[,] and A.B. has never been in the care of her parents. Multiple service providers and Dr. Lobb reported that the [C]hildren look to their foster parents for comfort and security. [N.T. Termination H'rg] at 37, 123–124. Dr. Lobb also opined that the [C]hildren have developed secure attachments to their respective foster parents. [**Id.**] at 98. . . . The OCYF caseworker, Ms. Diana, opined that all the [C]hildren's medical, educational, physical, and developmental needs are being met in their foster homes. [**Id.**] at 37. As such, the court finds that the [C]hildren's need for permanence outweighs the detriment of terminating their bond with Father. These children are in pre-adoptive homes with

caregivers who have demonstrated a commitment to care for these children long term.

*Id.* at 13–14. The testimonial evidence supports the court's findings.

At the time of the hearing, S.M.-B. was three years and eight months old, and A.B. was nearly three years old. The Children are in pre-adoptive homes, the only homes they have ever known, with the exception of S.M.-B., who was removed when she was nearly three months old because she sustained non-accidental injuries. N.T. Termination H'rg at 6-7, 38. Ms. Diana, Ms. Burlbaugh, and Ms. Stallard observed the Children in their respective foster homes "on numerous occasions," and they testified that the Children look to their foster parents to have their needs met. *Id.* at 37, 58, 140. Ms. Diana testified that terminating Father's and Mother's parental rights will not have a detrimental impact on the Children. *Id.* at 38. Rather, she testified that termination would serve the Children's needs and welfare. *Id.*

Although Dr. Lobb testified that the Children have a bond with Father insofar as they are aware "[t]hat is their dad," he agreed that the Children's "primary attachment" is with their respective foster parents. N.T. Termination H'rg at 98, 100. In fact, he opined that he would be concerned if the Children were removed from their respective foster homes. *Id.* at 123–24. Dr. Lobb testified regarding the termination of parental rights, as follows.

Q. And do you believe that termination of [Fathers and Mother's] parental rights would be harmful for either of the girls?

A. I do believe there will be some harm done. I think the [Children] know [Father] and [Mother], but at that same time . . . I feel that . . . to achieve permanency [for them] outweighs any

damage that would be done as a result of the termination of the parental rights.

*Id.* at 124. He explained on direct examination:

Q. What are those concerns that you have when the [C]hildren lack permanency?

A. I think that for the kids, there is not this sense of where they belong, and kids need that. I think the [C]hildren need that. They need to know that they have a permanent home somewhere and they have people who are committed to taking care of them long-term for the rest of their lives in some ways. So I think that's my main concern.

Q. And are there detriments to children when they don't have that permanency?

A. Yes, . . . I think that they can develop mental health kinds of symptoms, anxiety, or depression, they can have problems and adult relationships later in their life because they haven't had healthy relationships as a child growing up.

*Id.* at 99.

Based on the foregoing, we conclude the record supports the orphans' court's determination that terminating Father's parental rights would serve the needs and welfare of the Children. While the Children possess a bond with Father, it is clear that bond is outweighed by his inability to provide safety for the Children, and by the Children's need for permanence and stability. ***See In re A.S.***, 11 A.3d at 483 ("[I]n addition to a bond examination, the trial court **can equally emphasize** the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.") (emphasis added). Thus, Father's claim with respect to Section 2511(b) fails.

In his fifth issue, Father asserts, generally, that the court's findings are against the weight of the evidence. *See* Father's Brief at 7. However, he fails to present any argument regarding a weight claim in his brief. Accordingly, it is waived for our review. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").

In his sixth and final issue, Father baldly asserts that the orphans' court erred by not delineating its reasons for the termination orders prior to the expiration of the appeal period. Father asks this Court to determine "that a rule akin to that applied in custody cases should apply in termination of parental rights cases, and that the instant matter should be reversed." Father's Brief at 30. We reject this argument.

Father cites Section 5323 of the Child Custody Act,[9] which provides: "The court shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S. § 5323(d). This Court has interpreted Section 5323(d) to require trial courts to set forth the mandatory assessment of statutory custody factors "prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.*, 65 A.3d 946, 955 (Pa. Super. 2013). Conversely, there is no provision in the Adoption Act requiring courts to delineate the reasons for its decision on the record in open court or

_____

[9] 23 Pa.C.S. § 5321 *et seq.*

in a written opinion or order. To require so is a task for the Pennsylvania General Assembly. Pa. Const. art. II, § 1 ("The legislative power of this Commonwealth shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives."). Accordingly, we affirm the orders involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Orders affirmed. Father's Application for Special Relief granted.[10]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/27/2022

_____

[10] On January 31, 2022, Father filed an application requesting that this Court deem as deleted footnote 7 on page 13 of his appellate brief, relating to the inclusion of Dr. Lobb's third report in the reproduced record and his intent to seek inclusion of the report in the certified record before this Court. In his application, Father avers that the report was not entered into evidence in the subject proceeding. Therefore, he requests that this Court consider the aforementioned footnote in his brief omitted. We grant Father's application. In this disposition, we did not review Dr. Lobb's third report in the reproduced record.